IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:23-CV-208-M
(consolidated with 5:23-CV-402-M)

RONALD THAXTON,                            )
                                           )
                    Plaintiffs,            )
                                           )
v.                                         )
                                           )          **OPINION AND ORDER**
HALCYON GROUP INTERNATIONAL;               )
LLC, ECHELON SERVICES, LLC; and            )
ECHELON SERVICES NHO, LLC,                 )
                                           )
                    Defendants.            )
                                           )
                                           )

This matter comes before the court on Defendant Halcyon Group International, LLC's motion for

summary judgment ("Halcyon's Motion") [DE 49] and Defendants Echelon Services, LLC and Echelon

Services NHO, LLC's motion for partial summary judgment ("Echelon's Motion") [DE 47] (collectively,

"Motions").

For the reasons described below, Halcyon's Motion is GRANTED and Echelon's Motion is

GRANTED IN PART and DENIED IN PART.

## I. Statement of the Case

This is an employment dispute between Plaintiff Ronald Thaxton and Defendants Halcyon Group International, LLC ("Halcyon") and Echelon Services, LLC[1] ("Echelon") arising out of advisory work performed in Somalia on behalf of the U.S. Department of State.

Plaintiff filed a Charge of Discrimination (EEOC Charge No. 570-2022-03395) with the Equal Employment Opportunity Commission ("EEOC") against Echelon in October 2022. [DE 31] 9.[2] In January 2023, the EEOC dismissed the Charge and issued a notice of Plaintiff's Right to Sue. *Id.*; [DE 66] 3.

Plaintiff then filed his first complaint on April 18, 2023 bringing eight claims for relief: (1) Title VII claim for hostile work environment against Echelon; (2) Title VII claim for race discrimination against Echelon; (3) Title VII claim for color discrimination against Echelon; (4) Title VII claim for retaliation against Echelon; (5) 42 U.S.C. § 1981 claim for race discrimination against all Defendants; (6) § 1981 claim for hostile work environment against all Defendants; (7) § 1981 claim for retaliation based on race against all Defendants; and (8) termination in violation of North Carolina public policy against all Defendants [DE 1].

Before filing this first complaint, Plaintiff brought two additional Charges with the EEOC, this time against both Defendants (EEOC Charge Nos. 433-2023-0197, 433-2023-0198). [DE 31] 10. On April 26, 2023, the EEOC denied both Charges and issued a notice of Right to Sue. *Id.* at 10; [DE 66] 4.

Plaintiff filed his second complaint, 5:23-CV-00402-M, on July 7, 2025, bringing four Title VII claims for relief (against both Defendants): (1) hostile work environment based on race and color; (2) race discrimination; (3) color discrimination; and (4) retaliation [DE 31]. Upon Plaintiff's consent motion, the court consolidated his two complaints into this lead case, 5:23-CV-00208-M-RN. *See* [DE 30]. In both

---

[1] Echelon Services NHO, LLC, another named Defendant, is the fictitious name under which Echelon Services, LLC, does business in North Carolina and is not considered as a separate entity for purposes of this order.

[2] All pin cites to materials in the record will refer to the page numbers that appear in the footer appended to those materials upon their docketing in the CM/ECF system, and not to any internal pagination which blends Roman and Arabic numbers.

complaints, Defendant requests reinstatement with Defendants, lost wages and benefits, and compensatory damages in excess of $100,000. *See* [DE 1] 20–21; [DE 31] 15–16.

Halcyon filed its motion for summary judgment [DE 49] on October 30, 2024. Halcyon asks the court to grant judgment in its favor on all claims. Echelon filed its motion for partial summary judgment [DE 47] on October 30, 2024. Echelon asks the court to grant judgment in its favor on all except Plaintiff's retaliation claims. *See* [DE 47]. Echelon also requests the court find separately that Plaintiff is not entitled to compensatory damages and cap his lost wages, if any, at three months of compensation. *Id.* at 3.

## II. Undisputed Facts

Plaintiff is a Black male of African American descent in his mid-60s. [DE 1] 3. He has over thirty years of active-duty U.S. Army experience and has worked in the defense contractor industry for more than ten years. *Id.* He is a Ministerial Advisor trained and certified by the U.S. Department of Defense with over a decade of experience as an Advisor or Senior Advisor in various countries in both military and citizen capacities. *Id.*

Halcyon was founded in 2009 by Robert Crowley and Catherine Dunlap and specializes in providing counterinsurgency, stability, and influence operations to domestic and foreign governments. [DE 66] 6. All of Halcyon's business comes through contracts with the federal government. *Id.* Usually, Halcyon serves as a subcontractor in partnership with different "prime" federal contractors. *Id.* at 7. Echelon is also a government contractor that provides services to federal agencies, occasionally as a prime contractor. [DE 67] 2.

In 2020, Echelon won a prime contract with the Department of State to provide Ministry of Defense Advisory Team ("MODAT") services in Somalia. *Id.* Specifically, the MODAT would provide advice to the Somali Ministry of Defense on military strategy and organization. [DE 66] 8. Echelon engaged Halcyon—who had provided advisory services to the Somali Ministry of Defense since 2016—as its subcontractor for the MODAT project. *Id.* The two companies split staffing 51%-49%, respectively. *Id.*; *see* [DE 55-10]. Under the terms of the subcontract, dated June 2020, Halcyon could only contact the

3

federal government (relating to the MODAT) with Echelon's prior written permission; Echelon was otherwise the sole point of contact. [DE 66] 13; [DE 55-10] 6.

At any given time, the MODAT was staffed with a Senior Advisor and Advisor, which could be from either Echelon or Halcyon. [DE 67] 4. Each of these individuals had to meet the specific State Department qualifications set out in the MODAT statement of work. [DE 66] 14. Echelon would send potential MODAT staff possessing these qualifications to the State Department for final approval. *Id.* at 15; [DE 55-12] 2. Halcyon could recommend staff to Echelon for vetting and submission, but Echelon had discretion to present those individuals to the State Department. *Id.*; *see also* [DE 55-13]. Echelon appointed Lead Project Managers, who managed and oversaw MODAT staff responsibilities, including Thaxton. *See* [DE 55-14]. It was also Echelon's responsibility to set or adjust rotation deployment schedules for MODAT staff. [DE 66] 16.

Thaxton was hired by Halcyon in March 2021 as a Senior Advisor for the Somalia MODAT. [DE-67] at 2–3; *see* [DE 55-16]. Halcyon is listed on Plaintiff's W-2 as his employer. [DE 1] 3–4. Thaxton has a longstanding relationship with Crowley (Halcyon's President), including contemporaneous Army service. [DE 66] 20. Thaxton's initial offer letter provides for $168,000 of compensation per year, or $84,000 per three-month rotation; Thaxton would work one rotation followed by three months of leave without pay.[3] *Id.* at 21; [DE 66] 3. Thaxton could find other work during his off months. [DE 66] 21. His continued employment with Halcyon depended on the State Department executing each of its contract option periods for the MODAT (potentially through 2026). *Id.*; *see* [DE 55-16] 1.

Thaxton's primary responsibilities as Senior Advisor were to provide advice to the Somali Ministry of Defense on defense matters, including preparing strategies and policies as well as supervising staff. [DE 66] 25. Thaxton completed three rotations with the MODAT. His first rotation—which was only two months—took place from June to August 2021. [DE 67] 3; [DE 66] 25. His second rotation with the

---

[3] At some point, this increased to approximately $90,000 per three-month rotation. [DE 67] 22.

MODAT was January to March 2022, and his third rotation was July to September 2022. [DE 67] 3; [DE 66] 25.

For much of his time on the MODAT, Thaxton worked alongside a second Halcyon employee, Tony Cerillo. [DE 66] 25. In June 2022, Echelon directed Halcyon to remove Cerillo from the MODAT, ostensibly at the request of the State Department. *Id.* at 25–26; *see* [DE 55-22]. In Cerillo's place, Echelon filled the MODAT Advisor role with one of its employees, Nick Flint. [DE 66] 27. Thaxton and Flint have never met in person but exchanged email correspondence during Thaxton's third and final MODAT rotation. *Id.* Flint worked remotely. [DE 67] 4.

Sometime in 2022, Echelon assigned Michael O'Hara as Lead Project Manager for the MODAT. [DE 66] 17. Thaxton would communicate with O'Hara frequently, as well as with other Echelon employees including Jerry Hudson and John Evans (the Executive Program Manager). [DE 66] 27. Hudson and Flint are both British nationals. [DE 66] 4.

MODAT staff often interfaced with a Somali interpreter engaged by Echelon, Jibril Yusuf Abdi. [DE 66] 27–28; [DE 67] 4–5. Abdi is referred to in written communications by MODAT staff, including Plaintiff, by the nickname "Blackie." [DE 66] 26–28; [DE 67] 5; *see* [DE 55-22]; [DE 55-23]; [DE 55-24]; [DE 55-25]; [DE 25-26]; [DE 25-27].

Prior to Thaxton's final deployment with the MODAT (July to September 2022), Echelon had not received any complaints from Halcyon regarding his performance. [DE 66] 20.

In July 2022, Evans exchanged emails with Echelon and Halcyon staff regarding an incident with Abdi and a purportedly fabricated visa document. *See* [DE 50-11]. Allegedly, Thaxton "plagiarized his VISA application and caused [Abdi] some uncomfortable issues with [Somali] officials." *Id.* at 2. Evans instructed Thaxton to correct the visa issue and apologize to Abdi. [DE 67] 6.

In August 2022, after Halcyon had brought on Flint to replace Cerillo, O'Hara instructed Thaxton by email to provide Flint with contact information for the Somali Ministry of Defense and MODAT as part of his onboarding process. [DE 50-14] 3–4. Afterwards, Evans learned that during this onboarding

5

conversation Thaxton had allegedly been unwelcoming to Flint and questioned his qualifications. [DE 67] 6; [DE 50-15] 2–3. In a subsequent email to Thaxton, Evans again requested that Thaxton provide Flint with certain contact information and added, "[q]uestioning Nick's qualifications was unprofessional and will not be tolerated." [DE 50-14] 3. In his response, Thaxton challenged why he was responsible for providing this information when it was "the same information [O'Hara] had at his disposal?" *Id.* at 2. Thaxton also disagreed with Evans's characterization of his conversation with Flint. *Id.*

In September 2022, O'Hara emailed Thaxton about making Flint feel welcome in the MODAT team and including him in all meetings. [DE 50-15] 2. Later that month, Flint sent an email to the Director General of the Somali Ministry of Defense introducing himself and informing him that Thaxton and Abdi had Flint's contact information if there was any difficulty reaching him. [DE 50-17] 2.

On September 18, 2022, Thaxton notified Halcyon and Echelon that he had filed an Equal Employment Opportunity ("EEO") complaint with the State Department's Office of Civil Rights. [DE 66] 30; [DE 67] 7; [DE 50-18] 2. Thaxton stated that the complaint "highlight[s] Echelon['s] racial discrimination and hostile work environment[,]" both of which "became readily apparent this rotation." [DE 50-18] 2. Echelon responded through its General Counsel, Christopher Kachouroff, and requested a copy of the State Department's report. [DE 50-19] 2. Thaxton declined and stated he would no longer discuss the issue with Echelon personnel. *Id.* at 2. Meanwhile, Crowley (from Halcyon) responded to Thaxton separately and told him that Halcyon "[stood] with [him] 100 percent." [DE 55-30] 2.

On September 21, 2022, Thaxton sent Halcyon a detailed summary of his claims against Echelon for racial discrimination and hostile work environment sent to the State Department's Office of Civil Rights. *See* [DE 55-32]. That summary contains the following allegations in support of his claims:

- In March 2022, Echelon employee Jerry Hudson, who is white, made disparaging comments about the Somali Ministry of Defense officials, referring to them as "those people," "corrupt," and "stupid."

- Hudson was generally condescending to Thaxton and frequently interrupted him during

6

meetings with Somali staff.

- After Echelon dismissed Cerillo, who is Hispanic, in late June 2022, Thaxton received several emails from Echelon staff (including Evans, O'Hara, and Hudson) regarding Thaxton's performance. Collectively, Thaxton believes these demonstrate that Echelon staff wished to dismiss him because of his race:

  o July 29, 2022, email from Evans alleging that Thaxton had jeopardized the working relationship with Abdi because of Thaxton's purportedly fabricated visa documentation. [DE 50-11].

  o August 31, 2022, email from O'Hara directing Thaxton to provide MODAT contact information to new hire Flint, which Thaxton believes O'Hara could have done himself. [DE 50-14].

  o On September 1, 2022, email from Evans alleging Thaxton "made it quite clear to [Flint] that he is not welcomed to the [MODAT] team" and that Thaxton "did not provide [Flint] with [the requested contact information]." Evans also commented that Thaxton was "following the same modus operandi as [] Cerillo when [] O'Hara arrived in Somalia [Spring 2022]. This behavior by a subcontractor's employees will not be tolerated." [DE 50-15].

  o September 2, 2022, email from Evans telling Thaxton that "questioning [Flint's] qualifications was unprofessional and will not be tolerated." [DE 50-14].

  o September 15, 2022, email from O'Hara to Thaxton and staff specifically addressing Thaxton that "there is no such thing as a meeting that [Flint] isn't invited to go on . . . . [Flint] is new and he needs SA. Please make him feel welcome and include him in all meetings." [DE 50-16].

  o September 16, 2022, email from Flint to Somali Ministry of Defense personnel introducing himself and reading in part, "If [] there is anything you would like to

7

discuss or there are matters you would like me to assist you or your staff with, please do not hesitate to let me know. [] Thaxton and Blackie (our faithful fixer and interpreter) both have my contact details too so should your staff have any difficulty contacting me, [Thaxton] and Blackie will be happy to give them my details." [DE 50-17].

Thaxton generally contends that he was discriminated against on the basis of his race because he never saw white employees disciplined, receive emails that impugned his character, be asked to apologize to anyone, or be spoken down to. [DE 67] 10–11. Thaxton additionally claims he faced discrimination when passed over for the Lead Project Manager position, despite his qualifications, which was eventually filled by O'Hara. *Id.* at 10.

Echelon informed Halcyon through counsel on September 23, 2022, that it was suspending Thaxton from further rotations pending investigation of his discrimination and hostile work environment claims. [DE 66] 36. Thaxton completed his final rotation on September 26, 2022. [DE 67] 8. No other Halcyon employees were deployed to Somalia or worked on the MODAT after that date. [DE 66] 20. After his suspension by Echelon, Thaxton never asked Halcyon if there were other positions available, whether for the MODAT or other projects. [DE 66] 39.

In Fall 2022, Halcyon's outside counsel emailed Kachouroff in part to facilitate Echelon lifting Thaxton's suspension so that he could return to the MODAT. *See generally* [DE 55-34]. Kachouroff responded that he could not do so until he received certain documentation, including Thaxton's EEO complaint, and completed an internal investigation. *Id.* Failing to convince Echelon to lift the suspension, Halcyon informed Thaxton in November 2022 that he would not be redeployed for his scheduled rotation in January 2023. [DE 66] 43.

Halcyon made another written request for Echelon to lift Thaxton's suspension on March 15, 2023, so that he could be deployed on the next rotation to Somalia. [DE 55-43] 3–4. Echelon declined, "because [Thaxton's] grievance and [Echelon's] investigation have not been resolved." *Id.*

The prime contract and subcontract with the State Department expired in June 2023. [DE 67] 9. The State Department did not exercise any of its additional option years through 2026, so work on the MODAT ceased. *Id.*

### III.  Legal Standard

A party moving for summary judgment on a claim or defense bears the burden of "show[ing] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law" on that claim or defense. Fed. R. Civ. P. 56(a). Within the meaning of Rule 56: (1) a fact is "material" if a jury's decision regarding the fact's existence or nonexistence "might affect the outcome of the suit under the governing law"; and (2) a dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which [the movant] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant may demonstrate the absence of a genuine dispute of material fact by: (1) "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[,]" Fed. R. Civ. P. 56(c)(l)(A); or (2) showing that the record "do[es] not establish the absence or presence of a genuine dispute, or that [the nonmovant] cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(l)(B).

The Fourth Circuit has said:

> When the moving party has carried its burden, the nonmoving party must come forward with evidence which shows more than some metaphysical doubt that genuine and material factual issues exist. A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment. Rather, the nonmoving party must convince the court that upon the record taken as a whole a rational trier of fact could find for the nonmoving party.

*Austin v. Clark Equip. Co.,* 48 F.3d 833, 836 (4th Cir. 1995) (citations omitted). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and, pursuant to Rule 56(c), to "designate specific facts showing that there is a genuine issue for trial." *See Celotex,* 477 U.S. at 324 (quotation marks omitted).

Where the district court concludes that—based upon the record taken as a whole, when viewed in the light most favorable to the nonmovant as described above—a reasonable jury could render a verdict in favor of the nonmovant, summary judgment must be denied. *Anderson,* 477 U.S. at 248. Where, in light of the same, the court concludes that a jury could not reasonably render a verdict in the nonmovant's favor, summary judgment may be granted. *Id.* at 249–50.

## IV.    Discussion

Thaxton effectively brings eight counts against Defendants[4]: (1) Title VII claims for hostile work environment; (2) Title VII claims for race discrimination; (3) Title VII claims for color discrimination; (4) Title VII claims for retaliation; (5) 42 U.S.C. § 1981 claim for race discrimination; (6) § 1981 claim for hostile work environment; (7) § 1981 claim for retaliation based on race; and (8) termination in violation of North Carolina public policy. *See* [DE 1]; [DE 31].

Halcyon has moved for summary judgment on all claims against it [DE 49]. Echelon has moved for summary judgment on all claims except those for retaliation [DE 47]. Echelon also admits that issues of material fact preclude a determination of whether it was a "joint employer" of Thaxton. *Id.* Thus, for purposes of the Motions, the court will assume Echelon is Thaxton's employer.

At the outset, the court notes that Thaxton's claims are mostly premised on purportedly wrongful conduct by Echelon staff. Halcyon's liability, if any, depends mainly on whether it is Thaxton's joint employer. *See, e.g.,* [DE 65] 10–13. The Fourth Circuit has found that two parties may be considered joint employers and therefore both liable under Title VII and its progeny if they "share or co-determine those

---

[4] For purposes of these Motions, the court considers Thaxton's four Title VII claims (against only Echelon) in his original complaint [DE 1] and nearly identical four Title VII claims (against both Defendants) in his second complaint [DE 31] together.

matters governing the essential terms and conditions of employment." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). The Fourth Circuit in *Butler* elaborated that in determining whether a party is a joint employer,

> [t]hree factors are the most important. The first factor, which entity or entities have the power to hire and fire the putative employee, is important to determining ultimate control. The second factor, to what extent the employee is supervised, is useful for determining the day-to-day, practical control of the employee. The third factor, where and how the work takes place, is valuable for determining how similar the work functions are compared to those of an ordinary employee . . . . Courts should be mindful that control remains the principal guidepost for determining whether multiple entities can be a plaintiff's joint employers.

*Id.* at 414–15. However, later courts in this Circuit have clarified that "a joint employer relationship does not create liability in the co-employer for actions taken by the other employer" unless "it participates in the discrimination, or if it knows or should have known of the [other employer's] discrimination but fails to take corrective measures within its control." *Swindell v. CACI NSS, Inc.*, No. 5:17-CV-617-D, 2020 WL 5824024, at *7–8 (E.D.N.C. Sept. 30, 2020), *aff'd*, No. 20-2179, 2022 WL 3754531 (4th Cir. Aug. 30, 2022) (citations omitted) (collecting cases). Halcyon premises its summary judgment argument on this nuance. *See* [DE 51] 13–16.

Indeed, there is no dispute that Halcyon employed Thaxton. *See* [DE-67] at 2–3; [DE 55-16]. But Halcyon and Thaxton's employee-employer relationship does not automatically make Halcyon liable for Echelon's alleged conduct. If Thaxton's claims against Halcyon are not premised on specific wrongful conduct by Halcyon personnel, he must show that Halcyon knew about Echelon's discriminatory actions and did not take available corrective actions. *See Swindell*, 2020 WL 5824024 at *7–8.

A. Racial Discrimination

The court first addresses Thaxton's claims for racial discrimination ([DE 1] counts 2, 3, 5, and 8; [DE 31] counts 2 and 3). These claims are all premised on Defendants' purportedly racially motivated disparate treatment of Thaxton. *See generally* [DE 1]; [DE 31]. Although brought under Title VII, 42 U.S.C. § 1981, and North Carolina's N.C.G.S. §143-422.2, the court may consider these claims together.

11

*See Felder v. MGM Nat'l Harbor, LLC*, No. 20-2373, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (citing *Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 219 (4th Cir. 2016)) (noting that elements adverse action under Title VII and § 1981 "are effectively the same"); *Alexander v. Carolina Fire Control Inc.*, 112 F. Supp.3d 340, 350 (M.D.N.C. 2015) (considering Title VII and North Carolina claims together as "the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating" a state wrongful discharge claim under N.C.G.S. § 143–422.2) (quoting *Hughes v. Bledsoe*, 48 F.3d 1376, 1383 (4th Cir. 1995)).

Before bringing a civil action under Title VII, an individual must exhaust their administrative remedies with the EEOC. *See* 42 U.S.C. 2000e–5(b), (f)(1). An individual must file a charge with the EEOC within 180 days of the alleged unlawful employment practice (or 300 days if the proceeding was initiated "with a State or local agency with authority to grant or seek relief from such practice"). 42 U.S.C. 2000e–5(e)(1). The factual content of the charge sets the boundaries for any subsequent litigation begun after the administrative process. *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954–63 (4th Cir. 1996).

Title VII's disparate-treatment provision bars employers from intentionally discriminating against their employees on the basis of race or color. 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (citing 411 U.S. 792, 802–804 (1973)). Here, Thaxton has not presented any direct evidence of discrimination, so the court turns to the burden-shifting framework. *See id.*

In *McDonnell Douglas*, the Supreme Court laid out a three-step inquiry for evaluating claims arising under that provision. 411 U.S. 792, 802–804 (1973); *see Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025). The *McDonnell Douglas* framework aims to "bring the litigants and the court expeditiously and fairly to th[e] ultimate question" in a disparate treatment case—namely, whether "the

defendant intentionally discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253. Courts should "resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination." *Wannamaker-Amos*, 126 F.4th at 255 (quotations omitted).

At the first step, the plaintiff bears the "initial burden" of "establishing a prima facie case" by producing enough evidence to support an inference of discriminatory motive. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff succeeds, the burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Third, if the employer articulates such a justification, the plaintiff must then have a "fair opportunity" to show that the stated justification "was in fact pretext" for discrimination. *Id.* at 804. A plaintiff "may succeed [under *McDonnell Douglas*] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

Under step one of *McDonnell Douglas*, Thaxton bears the burden of establishing a prima facie case of discrimination under the following factors: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. 411 U.S. at 802; *Wannamaker-Amos*, 126 F.4th at 255. A reasonable inference of unlawful discrimination exists where a claimant can show he was treated differently than a similarly situated employee outside the protected class. *See Henry v. Vaughn Indus., LLC*, 450 F. Supp. 3d 671, 682 (E.D.N.C. 2020).

Thaxton argues that Defendants' racial animus influenced their failure to promote him to the position of senior advisor—a position later filled by Echelon employee O'Hara—as well as their discriminatory treatment of Thaxton relative to other employees, exemplified by disciplinary communications. *See, e.g.*, [DE 31] 12. It is undisputed that Thaxton satisfies the first prong of the inquiry.

13

[DE 1] 3. The court analyzes these separate theories, failure to promote and discriminatory treatment, in turn.

Thaxton's failure to promote argument centers on O'Hara—a white Echelon employee—who was brought on as the Lead Project Manager for the MODAT sometime in 2022. [DE 66] 17. Thaxton never applied for this position, though he claims he would have if given the opportunity. He served in similar roles prior to working with Defendants, so was ostensibly qualified. Yet, Thaxton explains, "Defendants selected [ ] O'Hara, a white male, to take on the role of Lead Project Manager under the MODAT[.]" [DE 63] 17. Failure to promote is an adverse employment action. *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 544 (4th Cir. 2003). And Thaxton's failure to apply for a promotion does not necessarily defeat his claim. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 431 (4th Cir. 2004) ("[I]f the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position.") (citation omitted).

Instead, Thaxton's failure to promote theory fails because he has not presented any evidence that "he [was] more qualified than [O'Hara] for the [Lead Project Manager] position." *Ware v. Potter*, 106 F. App'x 829, 832 (4th Cir. 2004). This is required for Thaxton to clear summary judgment. *See id* (granting summary judgment for this reason). Making all reasonable inferences in the nonmovant's favor, Thaxton has adequately demonstrated that he may have been qualified for the position. But that is only half of the inquiry. *See Fuller v. Rex Hosp., Inc.*, No. 5:20-CV-192-BO, 2022 WL 3362270, at *4 (E.D.N.C. Aug. 15, 2022) (finding summary judgment for defendant where plaintiff may have met the minimum requirements for a position but could not show he was more qualified than person hired). Thaxton has made no attempt to show that he was *more* qualified than O'Hara in 2022 for the Lead Project Manager role. *See Ware*, 106 F. App'x. at 832 (finding that bald assertions and conclusory arguments that plaintiff was more qualified did not raise a genuine issue for trial). For that reason, his racial discrimination claims premised on Defendants' alleged failure to promote him to Lead Project Manager fail.

Next, the court considers Thaxton's discriminatory treatment theory grounded in his purported

14

"mistreatment" by Echelon's employees during his final rotation. *See* [DE 62] 16. Thaxton puts forward several purported examples of discriminatory treatment from other employees outside of his protected class. *See Henry*, 450 F. Supp. 3d at 682. Specifically, Thaxton references the emails cited in his original EEO complaint to the State Department's Office of Civil Rights. *See* [DE 62] 16–19; [DE 55-32]. These are as follows:

- July 29, 2022, email from Evans alleging that Thaxton had jeopardized the working relationship with Abdi because of Thaxton's purportedly fabricated visa documentation. *See* [DE 50-11].

- August 31, 2022, email from O'Hara directing Thaxton to provide MODAT contact information to new hire Flint, which O'Hara could have done himself. *See* [DE 50-14].

- On September 1, 2022, email from Evans alleging Thaxton "made it quite clear to [Flint] that he is not welcomed to the [MODAT] team" and that Thaxton "did not provide [Flint] with [the requested contact information]." Evans also commented that Thaxton was "following the same modus operandi as [] Cerillo when [] O'Hara arrived in Somalia [Spring 2022]. This behavior by a subcontractor's employees will not be tolerated." *See* [DE 50-15].

- September 2, 2022, email from Evans telling Thaxton that "questioning [Flint's] qualifications was unprofessional and will not be tolerated." *See* [DE 50-14].

- September 15, 2022, email from O'Hara to Thaxton and staff specifically addressing Thaxton that "there is no such thing as a meeting that [Flint] isn't invited to go on . . . . [Flint] is new and he needs SA. Please make him feel welcome and include him in all meetings." *See* [DE 50-16].

- September 16, 2022, email from Flint to Somali Ministry of Defense personnel introducing himself and reading in part, "If [] there is anything you would like to discuss or there are matters you would like me to assist you or your staff with, please do not hesitate to let me know. [] Thaxton and Blackie (our faithful fixer and interpreter) both have my contact details too so

15

should your staff have any difficulty contacting me, [Thaxton] and Blackie will be happy to give them my details." *See* [DE 50-17].

Making all reasonable inferences from these communications, Thaxton has failed to present a prima facie case of unlawful discrimination based on alleged disparate treatment. First, the emails do not reflect any adverse employment action. Some of the communications could be read as reprimands of Thaxton, for example Evans's July 29, 2022, email regarding Thaxton's allegedly forged visa documentation or Evans's the September 2, 2022, email regarding Thaxton's conversation with Flint. But "[s]uch discipline, without evidence that the warning could lead to further disciplinary action, such as termination, does not constitute an adverse employment action." *Newman v. Giant Food, Inc.*, 187 F. Supp. 2d 524, 528–29 (D. Md. 2002), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003) (citing *Nye v. Roberts,* 159 F. Supp. 2d 207, 213–14 (D.Md. 2001)) (finding a written reprimand did not constitute an adverse employment action because "[r]eprimands do not automatically affect the terms and conditions of employment" and the reprimand did "not state that it would lead to her termination or demotion or a decrease in pay"); *see also Crawford v. Prince George's Cnty. Bd. of Educ.*, No. CV JKB-20-00048, 2023 WL 2600363, at *7 (D. Md. Mar. 21, 2023), *aff'd*, No. 23-1430, 2023 WL 6421010 (4th Cir. Oct. 2, 2023) ("It is well established that, without more, neither written nor verbal reprimands qualify as adverse employment actions.") (cleaned up) (gathering cases).

Second, other emails simply do not raise a reasonable inference of unlawful discrimination. For instance, Flint's introductory email to Somali Ministry of Defense informing them that "Thaxton . . . ha[d] [his] contact details too" if they had difficulty contacting Flint is facially innocuous. Thaxton cannot demonstrate how either cited email from Evans could hold a discriminatory motive—Evans did not know Thaxton was Black before he filed the EEO complaint with the State Department. *See* [DE 67] 7. Similarly, Thaxton does not explain how O'Hara's email directing Thaxton to provide Flint with relevant onboarding contact information gives rise to any inference of racial animus. He does not argue that providing this information was outside of his job description. Alleging that O'Hara—the Lead Project Manager of the

16

MODAT at that time—could have just as easily done it himself does not clear the bar. *See* [DE 55-32]; *see also Scott v. United Auto Credit Corp.*, No. 3:09CV363, 2011 WL 2457881, at *8 (W.D.N.C. June 16, 2011) ("The case law is clear in the Fourth Circuit that speculation and conjecture raise a mere possibility of discrimination rather than the reasonable probability which is necessary to support an inference of discrimination.") (citing *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 241–42 (4th Cir. 1982)).

Because Thaxton fails to present a prima facie case of discrimination for either his disparate treatment or failure to promote theories, the court need not address Defendants' pretext arguments. *See McDonnell Douglas*, 411 U.S. at 802–804; *see also Johnson v. Armco Inc.*, 548 F. Supp. 1109, 1111 (D. Md. 1982) ("When a plaintiff fails in his initial attempt to prove a prima facie case, the court need inquire no further and defendant need not articulate any reasons for its actions.") (citations omitted); *Bennett v. New Foundations Child. & Fam. Servs., Inc.*, No. CIV.A. 8:08557HFFBHH, 2010 WL 517900, at *2 (D.S.C. Feb. 10, 2010) (finding that since plaintiff failed to set forth a prima facie case of discriminatory discharge, the court did not need to address pretext arguments) (citing *Karsten v. Kaiser Found. Health Plan*, 36 F.3d 8, 11 (4th Cir. 1994)).

Nor has Thaxton presented any evidence that Halcyon participated in the purported discrimination or knew about Echelon's discriminatory actions and did not take corrective actions it could have. *See Swindell*, 2020 WL 5824024 at *7–8. All of the cited correspondence are from Echelon personnel. Moreover, the record reflects that when Halcyon heard complaints about Thaxton from Echelon, it stood up for him. *See, e.g.*, [DE 26] 29.

Accordingly, the court grants summary judgment on Thaxton's racial discrimination claims ([DE 1] counts 2, 3, 5, and 8; [DE 31] counts 2 and 3) in Defendants' favor.

B. Hostile Work Environment

Next, the court considers Thaxton's hostile work environment claims ([DE 1] counts 1 and 6; [DE 31] count 1). The court can consider hostile work environment claims brought under Title VII and § 1981 together. *See Torres v. Duke Energy Progress, LLC*, 688 F. Supp. 3d 307, 311 n1 (E.D.N.C. 2023)*; Gates*

17

*v. Waffle House Corp.*, No. 4:18-CV-00140-BO, 2019 WL 613555, at *3 (E.D.N.C. Jan. 9, 2019), *report and recommendation adopted*, No. 4:18-CV-140-BO, 2019 WL 615364 (E.D.N.C. Feb. 13, 2019) (citing *White v. BFI Waste Servs.*, 375 F.3d 288, 295 (4th Cir. 2004)).

To bring a hostile work environment claim, an individual must show: (1) unwelcome conduct; (2) that is based on race or color; (3) that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment; and (4) is imputable to the employer. *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). Moreover, that individual's protected characteristic must be the "but for" cause of the alleged harassment. *Ali v. WorldWide Language Res., LLC*, 686 F. Supp. 3d 430, 450 (E.D.N.C. 2023) (citations omitted).

To determine whether conduct is sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, the court considers Thaxton's allegations both subjectively and objectively. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). In other words, both the employee himself and a reasonable person in the employee's position must consider the conduct to be sufficiently severe or pervasive as to alter his conditions of employment. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam); *Ali*, 686 F. Supp. 3d at 446–47. The objective component helps courts "police the baseline for hostile environment claims." *Ali*, 686 F. Supp. 3d at 446 (citations omitted).

The court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris*, 510 U.S. at 23). Title VII and § 1981 do not create a "general civility code for the American workplace." *Id.* at 447 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). For instance, "teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms of conditions of employment." *Id.* (collecting cases). And for an employer to be liable for this harassment, an individual must demonstrate that "after having acquired

18

. . . knowledge of the allegedly harassing conduct, the employer had taken no prompt and adequate remedial action to correct it." *Id.* at 447–48 (citing *Mikels v. City of Durham*, 183 F.3d 323, 329 (4th Cir. 1999)).

Thaxton's theory of Defendants' "severe and pervasive" hostile work environment is much the same as his allegations in the September 2022 EEO complaint to the State Department's Office of Civil Rights. *See* [DE 55-32]. In addition to the previously discussed emails by various Echelon employees, Thaxton alleges that:

- In March 2022, Echelon employee Jerry Hudson, who is white, made disparaging comments about the Somali Ministry of Defense officials, referring to them as "those people," "corrupt," and "stupid."

- Hudson was generally condescending to Thaxton and frequently interrupted him during meetings with Somali staff.

Though not included in the original EEO complaint to the State Department, Thaxton also references Defendant's "blatantly racist" nickname for their interpreter Abdi ("Blackie"). *See* [DE 1-2] 5. Thaxton avers he reported his concerns about the nickname in July 2021 to Crowley at Halcyon; Crowley allegedly told him to discuss the issue with Abdi. [DE 70-1] 7.

Taken as a whole, the record does not present any genuine issue for trial regarding Thaxton's hostile work environment claims. First, the cited "unwelcome" correspondence from Echelon staff is neither sufficiently pervasive nor based on Thaxton's race. *Okoli*, 648 F.3d at 220. As previously discussed, several of the emails are facially innocuous. *See, e.g.*, [50-14]; [50-17]. Two of the emails are from Evans, who at the time of sending did not know Thaxton's race. *See* [50-11]; [50-15]; [DE 67] 7. None indicate that Thaxton's race was the "but for" cause of the harassing correspondence. *Ali*, 686 F. Supp. 3d at 450 (finding summary judgment on hostile work environment claim where alleged harassment "was not motivated by race . . . , but by discord over [pay] . . . and other various interpersonal grudges.").

Likewise, neither Abdi's nickname nor Hudson's purported behavior clear the hurdle. First, Hudson's allegedly racist remarks were not directed towards Thaxton. It is also undisputed that Hudson

later apologized after Thaxton voiced his objection. *See* [DE 66] 34. Second, like Hudson's remarks, Abdi's nickname is unrelated to Thaxton personally. Both Echelon and Halcyon staff, including Thaxton, referred to Abdi as "Blackie" several times in written correspondence. [DE 66] 26–28; [DE 67] 5; *see* [DE 55-22]; [DE 55-23]; [DE 55-24]; [DE 55-25]; [DE 25-26]; [DE 25-27]. Rather than demonstrate racial animus, several of these communications reveal that Abdi was highly valued by Defendants and an important part of the MODAT team. *See, e.g.*, [DE 55-29] 8 (Flint referring to Abdi as the "faithful fixer and interpreter"); [DE 55-22] 3 (Evans instructing MODAT team to "ensure we continue to respect our interpreter Blackie . . . . We can't afford to jeopardize our relationship with him.").

In *Swindell*, the court considered an analogous claim where plaintiff, "the sole African-American contractor" working in a "high stakes military environment" experienced "ten [harassing] comments during a seven-week period of his nearly five months of employment[.]" *Swindell*, No. 5:17-CV-617-D, 2020 WL 5824024, at *10. Ultimately the court determined that "no rational jury" could find that these comments created a "racially abusive or hostile work environment." *Id.* Only "four of the ten comments were directed at [plaintiff][,]" none "include[d] physical threats[,]" and they "did not concern a disciplinary action or termination decision[.]" *Id.* None of the alleged harassing behaviors here included any threats of physical violence or termination. If anything, the allegedly offensive comments in *Swindell* were more severe than those alleged here; neither Hudson's remarks nor Abdi's nickname were ever directed towards Thaxton personally.

Thaxton may have been personally offended by some or all of the communications sent by Echelon staff, by Abdi's nickname, and by Hudson's behavior. But "Congress and the Supreme Court . . . have made clear that Title VII does not require . . . a utopian workplace in order for an employer to avoid liability for a hostile work environment." *Swindell*, No. 5:17-CV-617-D, at *11 (quoting *Iskander v. Dep't of Navy*, 116 F. Supp. 3d 669, 677). Taking the entire record in the light most favorable to Thaxton, no rational jury could find these instances sufficiently severe or pervasive to create a racially hostile work environment. *See id* (collecting cases).

20

The court will grant summary judgment on Thaxton's hostile work environment claims in Defendants' favor ([DE 1] counts 1 and 6; [DE 31] count 1).

C. Retaliation

Finally, the court considers Thaxton's retaliation claims against Halcyon only ([DE 1] count 7; [DE 31] count 4). Thaxton argues Halcyon is independently liable for suspending him in November 2022 and otherwise responsible for Echelon's actions as his joint employer. *See* [DE 65] 14–17. Specifically, Thaxton alleges that his EEO complaint to the State Department Office of Civil Rights in September 2022 amounts to protected activity that resulted in his ultimate removal from the MODAT. *See* [DE 31] 15.

Like his claims for racial discrimination, to sustain a retaliation claim under Title VII and § 1981 Thaxton may present direct evidence or proceed under the *McDonnell Douglas* burden shifting framework. *See Ali,* 686 F. Supp. 3d at 457. The court assumes without deciding that Thaxton has established a prima facie case of retaliation, and that his November 2022 suspension is a de facto termination.

Even so, no rational jury could find that Halcyon terminated Thaxton's employment in retaliation for his EEO complaint to the State Department in 2022, or for any other unlawful reason. It is undisputed that Echelon effectively had veto power over MODAT staff. *See* [DE 66] 14–15. It was Echelon's responsibility to send potential MODAT staff to the State Department for final approval. *Id.* at 15; [DE 55-12] 2. Halcyon could recommend staff to Echelon for vetting and submission, but Echelon had discretion to present these recommendations to the State Department. *Id.*; *see also* [DE 55-13]. Echelon also retained the discretion to revoke or rescind its authorization for a Halcyon employee to work on the MODAT. *Id.* at 18; *see* [DE 55-11] 202–03.

In other words, Thaxton's continued work on the MODAT was at Echelon's pleasure. There is no evidence in the record to suggest Halcyon could have somehow overruled Echelon to keep Thaxton on the MODAT. In *Ali*, the court rejected a government contractor's retaliation claim premised on unlawful termination where defendant retained no discretion to keep the contractor employed. 686 F. Supp. 3d 458. The court explained that defendant terminated the contractor "due to [his] removal from the [United States

Special Operations Command ("SOCOM")] contract and his resulting inability to access the U.S. Military Client's facilities under the SOCOM contract[,]" which was a prerequisite to his continued employment. *Id.* Similarly, even assuming Halcyon terminated Thaxton, there is no evidence that it did so for any other reason than Echelon had the discretion to remove him from the MODAT.

The record instead reflects that Halcyon tried on multiple occasions to change Echelon's mind and get Thaxton back on the MODAT. *See, e.g.*, [DE 55-33]; [DE 55-34]; [DE 55-43] 3–4. Halcyon also expressed support for Thaxton after he informed them of his EEO claim to the State Department's Office of Civil rights. *See* [DE 55-30] (Crowley writing that Halcyon "stand with you 100% Ron.").

For this reason, Thaxton's retaliation claims premised on his purported termination by Halcyon in November 2022 fail.

Halcyon is also not liable as Thaxton's joint employer. There is no dispute that Halcyon employed Thaxton. *See* [DE-67] at 2–3; [DE 55-16]. But for Thaxton's claims against Halcyon to succeed on a joint employer theory, he must show that Halcyon knew about Echelon's discriminatory actions and did not take corrective actions it could have. *See Swindell*, 2020 WL 5824024 at *7–8. Thaxton has not done so. Halcyon lacked the authority to reinstate Thaxton to the MODAT after Echelon requested his removal. *See* [DE 66] 14–15; [DE 55-12] 2; [DE 55-13]; [DE 55-11] 202–03. Thus, redeploying him was unavailable as a potential corrective action. Also, the record reflects that Halcyon used multiple avenues to try and lift Thaxton's suspension. For instance, on November 9, 2022, counsel for Halcyon asked counsel for Echelon (Kachouroff) to discuss Thaxton's return to work, specifying that "Halcyon would like to see that happen[.]" [DE 55-34] 3. In January 2023, Halcyon again requested that Thaxton be reinstated, emphasizing that "[Halcyon] wants Ron back in Somalia and believe that he should already be there." [DE 55-41] 4.

Thaxton argues that "material questions of fact exist about whether Halcyon took all corrective measures within its control[,]" and suggests Halcyon could have refused to suspend him and report Echelon's behavior to the State Department. [DE 65] 13. The court disagrees. Thaxton's speculative

suggestions about alternative actions Halcyon could have taken fail to create a triable issue regarding Halcyon's joint employer liability. *See Swindell*, 2020 WL 5824024 at *7–8.

For these reasons, the court will grant summary judgment to Halcyon on Thaxton's retaliation claims ([DE 1] count 7; [DE 31] count 4).

### D. Damages

Echelon has separately moved to cap Thaxton's damages at $90,000 (for one MODAT rotation) arguing that any lost wages beyond that amount were not possible given that the MODAT was terminated in June 2023. [DE 54] 18. Echelon also argues that Thaxton's claim for compensatory pain and suffering damages fail as a matter of law. *Id.* at 19. The amount of damages, if any, will be determined at trial. Though Thaxton may not receive all back pay requested, issues of material fact preclude ruling now that Thaxton would have only worked one more rotation. *See, e.g.*, [DE 66] 43, 50 (Halcyon requesting Thaxton's staffing on rotations in January *and* March 2023). Moreover, Thaxton's testimony regarding his alleged compensatory damages is sufficient to survive summary judgment. *See* [DE 70-1]; *Williams v. AT&T Mobility, LLC*, No. 5:19-CV-00475-BO, 2022 WL 17637418, at *4 (E.D.N.C. Dec. 13, 2022) (quoting *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546 (4th Cir. 2003)) ("[P]laintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress.").

**V.     Conclusion**

Based on the foregoing, the court orders as follows:

1.      Halcyon's Motion [DE 49] is GRANTED.

2.      Echelon's Motion [DE 69] is GRANTED IN PART and DENIED IN PART, specifically:

      a.      Summary judgment is GRANTED on all counts other than Plaintiff's retaliation claims; and

      b.      DENIED as to its request to cap Plaintiff's damages.

3.      The remaining issues for trial are Plaintiff's retaliation claims against Echelon ([DE 1] counts 4 and 7; [DE 31] count 4).

SO ORDERED this ___11th___ day of September, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

24